**UNITED NUCLEAR CORPORATION,**
Plaintiff,

v.

**COMBUSTION ENGINEERING, INC.,**
Defendant.

Civ. A. No. 68–1395.

United States District Court
E. D. Pennsylvania.

July 3, 1969.

Counsel for the plaintiff are J. B. H. Carter, and John G. Harkins, Jr., of Pepper, Hamilton & Scheetz, Philadelphia, Pa., and Arthur H. Kahn, of Schnader, Harrison, Segal & Lewis, Philadelphia, Pa. and Charles C. Parlin, Jr., of Shearman & Sterling, New York City, for the defendant.

## OPINION AND ORDER

FULLAM, District Judge.

This is a private antitrust action under 15 U.S.C. § 26, arising out of the sale of 21% of the stock of United Nuclear Corp., the plaintiff, by the Olin Mathieson Chemical Corp. to the defendant, Combustion Engineering, Inc. On July 1, 1968, plaintiff filed its complaint alleging that this acquisition violated section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 7 and 8 of the Clayton Act, 15 U.S.C. §§ 18, 19.

On July 1, 1968, after hearing, I entered a temporary restraining order which prevented Combustion Engineering from exercising its rights as a shareholder of United Nuclear. This order, as later modified on July 8, 1968, and September 20, 1968, remains in effect.

It has been stipulated that the hearing on plaintiff's request for preliminary injunction be treated as the final hearing. The record has since been supplemented by certain depositions and stipulations, the most recent of which was filed on May 7, 1969.

After reviewing the entire record and considering the proposed findings of fact and conclusions of law submitted by counsel, I now enter the following

## FINDINGS OF FACT

1. Plaintiff, United Nuclear Corporation, is a Delaware corporation with headquarters at Elmsford, New York, and offices, manufacturing facilities, and laboratories in New York and in other states.

2. Defendant, Combustion Engineering, Inc., is a Delaware Corporation with principal offices in New York City, and offices, manufacturing facilities and other facilities in various states and foreign countries.

3. Combustion Engineering transacts business within the Eastern District of Pennsylvania.

4. Both United Nuclear Corporation and Combustion Engineering, Inc. are engaged in interstate commerce.

5. United Nuclear Corporation has 4,561,158 shares of common stock issued and outstanding. On June 27, 1968, Combustion Engineering, Inc. bought 978,403 shares of United Nuclear Corporation from Olin Mathieson Corporation. This acquisition of approximately 21% of United Nuclear Corporation's stock made Combustion Engineering, Inc. the largest single stockholder of United Nuclear Corporation.

6. Since the end of World War II, efforts have been underway to develop the necessary technology to utilize nuclear energy as a means of producing electricity. By the early 1960's, experimental nuclear power plants were producing electricity for retail consumption, but production costs were too high in comparison with existing fossil-fuel plants.

7. In 1962, the first nuclear power plants with a 400 megawatt of electricity

rating (MW$_e$) were ordered. Units of this size are competitive with fossil-fuel production. Since 1962, nuclear systems have been ordered with 800, 1000, and 1,100 MW$_e$ capacities.

8. From 1953 through June of 1967, orders have been placed for nuclear power plants as set forth in Appendix A.

9. In addition to the orders referred to in Finding 8 above, 14 utilities have announced plans to build nuclear generation plants. The average capacity of these proposed plants is 904.3 MW$_e$.

10. In general, it takes about four to six years from the time a nuclear power plant is ordered until it is commercially operable.

11. In nuclear power plants, the energy source is uranium. Steam to operate the generators is produced in a large and complex apparatus known as the Nuclear Steam Supply System (hereinafter the NSSS unit).

12. Two basic types of NSSS units are now on the market: the boiling water reactor and the pressurized water reactor. The technical differences between these two types of reactors are not significant to this action.

13. The main element of an NSSS unit is the pressure vessel or reactor. Uranium fuel assemblies, control rods, and various other instruments are housed in the reactor, and surrounded by water. External to the reactor are the components necessary to transfer the energy output of the reactor to the more or less standard generating and transforming equipment.

14. The nuclear fuel for the reactor is a uranium compound which is formed into pellets and placed inside tubes which are approximately one-half inch in diameter and 12 to 14 feet in length. These tubes are arranged in the reactor in clusters to form a unit called a fuel assembly. Thirty to forty thousand tubes are generally required, and the exact number in each cluster varies greatly from one reactor to another. Since the tubes are immersed in water for long periods, they must be made of corrosion-resistant material. At present, a zirconium alloy is most commonly used for these fuel tubes.

15. The hardware portion of each NSSS must be individually designed to meet the requirements of the ordering utility. As a result, it is necessary in each case to design and engineer the uranium compound itself, the number and arrangement of fuel tubes, and the location of the fuel assemblies within the reactor.

16. The fuel which is placed in the NSSS unit initially is referred to as the core. During the operation of the unit, the fissionable uranium isotope, U$_{235}$, is depleted (this process is referred to as "burn-up"), and efficiency-reducing materials known as poisons are developed. After 12 to 18 months of operation, the NSSS unit is shut down, approximately one-third of the fuel assemblies are replaced, the fuel assemblies are relocated, and the poisons withdrawn. Thereafter, one-third of the fuel is replaced annually for the life of the reactor. The replacement fuel assemblies are referred to as reloads or reload batches, and the process of fuel replacement and reorganization is termed fuel management.

17. The estimated useful life of a nuclear generating station is approximately 30 years. A complete station of the 800 to 1000 MW$_e$ variety, including land, buildings, hardware, and the initial core, costs about $150,000,000. The NSSS unit alone costs approximately $30,000,000 to $40,000,000; the initial core costs about $25,000,000 to $30,000,000; and each reload batch costs about $8,000,000 to $10,000,000. Based on present cost levels, fuel costs projected over the life of the reactor will total between $250,000,000 and $300,000,000 for each reactor.

18. Nuclear fuel assemblies ("fabricated fuel") are the end-products of a highly sophisticated and complex manufacturing process. The separate steps of this process are as follows:

(a) Uranium deposits must be located and mining operations undertaken.

(b) Crude ore is put through a milling process for the extraction of the uranium. The end-product of the milling operation is $U_3O_8$, or, in trade parlance, uranium concentrate or yellowcake.

(c) Yellowcake is then purified and converted into uranium hexafluoride gas, $UF_6$.

(d) The uranium hexafluoride gas is then put through an isotopic enrichment process, which is a gaseous diffusion method of increasing the percentage content of the fissionable $U_{235}$ isotope. In general, this process increases the $U_{235}$ content from .07% to the range of 2.5% to 3.2%.

(e) The enriched uranium hexafluoride is then converted into a uranium dioxide powder, $UO_2$.

(f) The uranium dioxide powder is then machine pressed into a pellet form, and the pellets are then ground to the specification for a particular reactor and tube design.

(g) At this point, it is necessary to provide the suitable zirconium tubing which will house the uranium dioxide pellets.

(h) After the finished fuel has been used in the reactor for 12 to 18 months, a portion thereof is removed. The used fuel is then put through a recovery process to salvage any of the remaining elements that are commercially valuable.

19. Various steps of the above process are performed by different corporations in this country. Participation in the fuel process is as follows:

(a) Presently, forty-seven entities (companies or joint ventures of two or more companies), are engaged in exploration for uranium ore. Combustion Engineering is a participant in one of these joint-ventures.

(b) Seventeen companies presently have active uranium mining and milling operations. Kerr-McGee holds the largest uranium reserves, and is the largest uranium producer. United Nuclear has the second largest reserves, approximately 15% of the known $8-per-pound reserves, and is also the second largest producer of uranium. Combustion Engineering does not have any mining or milling operations.

(c) Conversion of yellowcake to uranium hexafluoride is performed by Allied Chemical. Kerr-McGee has recently entered into this field and has accepted contracts to perform this service. Neither United Nuclear nor Combustion Engineering performs this process.

(d) The enrichment process is performed exclusively by the Atomic Energy Commission (hereinafter the AEC), and, under present regulations, only domestic uranium will be enriched for use in the United States.

(e) United Nuclear, Kerr-McGee, the NUMEC Division of Atlantic Richfield, and the Nuclear Fuel Services Corporation offer the service of converting uranium hexafluoride to uranium dioxide. General Electric also performs this conversion process, but does not offer the service to the public.

(f) United Nuclear, Kerr-McGee, Nuclear Fuel Services, and NUMEC offer the service of pelletizing the uranium dioxide. General Electric and Westinghouse perform this service only for their own use.

(g) United Nuclear, Kerr-McGee and NUMEC offer pellets to the public.

(h) Nuclear Fuel Services is the only company presently engaged in the recovery and reprocessing of spent fuel. General Electric has announced plans to build the necessary facilities to engage in this process.

(i) Zirconium tubing is presently manufactured and sold by the Wolverine Company, American Metal Climax, and Sandvik Special Metal Company. Sandvik Special Metal is owned in part by United Nuclear.

20. The mechanical steps that are required to produce fabricated fuel assemblies are as outlined in Finding 18 above. However, of more importance is the de-

sign and engineering work to insure that the fuel will perform properly in the reactor, and produce the specified $MW_e$ output. There is a marked distinction between a company which offers a particular service in the fuel cycle, and a company which performs the service and is also responsible for the design and engineering work.

21. At present, General Electric, Babcock & Wilcox, Westinghouse, Combustion Engineering and United Nuclear are the only companies which have contracted to supply finished-fabricated fuel. In addition, in 1968 NUMEC submitted bids for fabricated fuel for the first time.

22. One of the most sophisticated aspects of the nuclear power process is fuel management. This term refers to the removal and replacement of fuel assemblies, relocation of assemblies, and the guidance necessary to attain peak utilization of the fuel while it is in the reactor. General Electric, Babcock & Wilcox, Westinghouse, Combustion Engineering, and United Nuclear supply this service to their fuel customers. United Nuclear contemplates offering this service in instances in which it is not the fuel supplier. Some utilities, either alone or in conjunction with consultants, are in the process of developing their own fuel management competence.

23. General Electric, Babcock & Wilcox, Westinghouse, and Combustion Engineering are the only suppliers of NSSS units at the present time.

24. It has been the practice of utilities to require thermal warranties from the NSSS manufacturers. Under a thermal warranty, an NSSS supplier guarantees a specific $MW_e$ output. As a consequence of this business practice, and the interrelationship of design between the NSSS unit and the fabricated fuel, NSSS manufacturers have insisted that the original core, or at least the design and fabrication thereof, be part of the NSSS contract.

25. Utilities in some instances lease from the AEC the uranium necessary for the core, and contract with the NSSS supplier for fabrication and design services only. In other instances utilities purchase the uranium separately, and contract for fabrication and design services only.

26. To date, the NSSS manufacturers have not been willing to provide the utilities with the design specifications for the fabricated fuel.

27. The Northeastern Utilities Group intends to assume the responsibility of fuel design for its reactors in the future. In that event, the utility would no longer require a thermal warranty, but would require only a mechanical warranty from the NSSS supplier. Consequently, it is probable that the NSSS suppliers would not require the utility to purchase the core from them. It is probable that within the next five years there will be utilities purchasing cores separate from the NSSS hardware.

28. Most NSSS contracts have provided for three to nine reload batches to be supplied by the NSSS vendor, in addition to the original core. Utilities have varied in their buying practices; some have elected to enter binding contracts for the NSSS vendor to supply a certain number of reloads; others have obtained an option to purchase reloads which must be exercised by a certain date; and still others have utilized a firm contract for some reloads and options for other reloads.

29. Reload contracts have taken two forms: comprehensive, and fabrication-only. Under a comprehensive fuel bid, the supplier purchases uranium, provides all the services necessary to provide finished fuel assemblies, and is responsible for all the design and engineering work. Under a fabrication-only contract, the utility procures the uranium and provides certain services, and the supplier is responsible for the final fabrication and overall design. A third alternative procedure is currently being developed: the utility provides all the design work, and suppliers merely perform one or all of the steps in the fuel process.

30. Under present conditions, it is necessary for a utility to order reloads approximately two years prior to the date of insertion into the reactor. Many utilities have chosen to order substantially in advance of this two-year "lead-time" schedule.

31. Since 1966, orders for approximately $1,000,000,000 in replacement fuel have been placed. United Nuclear has bid on approximately one-half of these and has been awarded reload contracts aggregating approximately $200,000,000.

32. Most of the reloads which have already been ordered will not be delivered until 1973 or later.

33. The AEC predicts that in 1975 the dollar-volume of sales of nuclear fuel products necessary to meet the demands for initial cores and reloads will be $880,000,000, and by 1980 this figure will have increased to $1,625,000,000 annually. These figures reflect the total expenditures to provide finished fuel assemblies, i. e., uranium costs, plus all the necessary services relating to the production of finished fuel assemblies.

34. The AEC predicts that by 1975 the expenditures for initial cores and reloads will be approximately equal, and by 1980 reloads will account for 66% of the nuclear fuel market.

35. Directly or through joint-ventures, United Nuclear Corporation currently operates nine uranium mines and has one additional mine in the initial development stage. It is engaged in an exploration program encompassing approximately 800,000 acres.

36. United Nuclear's operational milling capacity is 3,500 tons of ore per day, with an auxiliary plant capable of handling an additional 1,500 tons per day. Through June of 1968, United Nuclear had supplied approximately 19% of the yellowcake marketed for commercial use (excluding sales to the AEC).

37. Conversion of uranium hexafluoride to uranium dioxide and pelletizing are performed by theHematite, Missouri plant of United Nuclear. Fabrication of reload fuel assemblies is performed in New Haven, Connecticut.

38. United Nuclear's main research and development operation is in Elmsford, New York, and its critical testing facilities are located in Pawling, New York. A critical testing facility is an essential for the design and engineering services associated with marketing fabricated fuel.

39. United Nuclear employs about 1,840 persons, in addition to those employed in partnership enterprises or partially-owned subsidiary operations. Of these direct employees, about 225 have engineering or scientific degrees, including 91 who have advanced degrees.

40. In 1962, United Nuclear decided to enter into nuclear fuel production. Within a few years, it had successfully bid on and obtained contracts to supply reloads to three of the early experimental reactors, Elk River, Pathfinder, and Bonus. During the same period, it was a prime supplier of the nuclear fuel requirements of the United States Navy. As a consequence of this experience, United Nuclear developed a competent technical staff, and established its reliability at an early date.

41. United Nuclear has bid on, and received, contracts to supply reload fuel for the following NSSS units:

(a) A firm contract for $8,824,000, and an agreement to supply (if the utility exercises its option) $11,348,000, for Commonwealth Edison's 200 MW$_e$ Dresden #1 plant. The bid date was February 1966.

(b) A contract to supply $250,000 worth of fuel assemblies to Yankee Atomic Electric Company's 175 MW$_e$ Yankee Rowe plant. The successful bidder will receive a $4,600,000 reload contract. The bid date was June 1967.

(c) A contract for $60,028,000 to supply American Electric Power's 1,054 MW$_e$ Donald Cook #1 plant. The bid date was July 1967.

(d) A firm contract for $54,986,000, to supply Consolidated Edison's 1,115 MW$_e$ Nuclear Four plant, and an agreement to supply (if the utility exercises its option) a like amount of fuel to Consolidated Edison's Nuclear Five plant. The bid date was April 1968.

42. United Nuclear has bids currently under consideration for Consumers Power Palisades and Midland #1 and #2 (aggregate value between $93,000,000 and $197,000,000, and an average MW$_e$ per unit of 667 MW$_e$); Detroit Edison and Fermi #2 plant (aggregate value $72,000,000); and Northeast Utilities Haddam Neck (aggregate value of $15,-000,000). Consumers Power has announced that its bid evaluation is currently suspended.

43. United Nuclear submitted bids, but has not received reload orders at the following: Commonwealth Edison Dresden #1, and Zion #1 and #2, American Electric Power Donald Cook #2, Consolidated Edison Indian Point #1, and Carolina Power & Light #1 and #2.

44. United Nuclear submitted a bid to consultants of Baltimore Gas & Electric for Calvert Cliff #1 and #2. However, at the time the bid was submitted, Combustion Engineering had already received the contract.

45. United Nuclear has also sold uranium dioxide pellets to other fuel fabricators, including sales to Combustion Engineering aggregating $1,500,000.

46. Sandvik Special Metals has sold zirconium tubing to Combustion Engineering, Westinghouse and Babcock & Wilcox.

47. United Nuclear has sustained losses on its sale of nuclear fuel to utilities of $124,000 in fiscal 1967 and $311,-000 in fiscal 1968.

48. United Nuclear's engineering and technical staff is of the highest caliber, and, as a result of having submitted bids for reloads for every kind of NSSS unit being manufactured, its staff has acquired significant experience and competence in reload design and manufacture.

49. Combustion Engineering's Utility Division, which markets the NSSS units and a wide variety of other electric-generating equipment, produced approximately one-third of the total company revenues in 1967.

50. Combustion Engineering is a major participant in the utility equipment field. It manufactures many of the NSSS components within its own organization, and markets components for these units to General Electric and Westinghouse.

51. Combustion Engineering does not own any ore reserves, and of all the steps in the fuel cycle, it performs only design and engineering services, fabrication, and fuel management.

52. Combustion Engineering is a co-venturer in a uranium exploration project. No ore deposits have been located; however, the geological forecast for discovery in the area of exploration is favorable.

53. Combustion Engineering has purchased approximately 7,000,000 pounds of yellowcake or its equivalent in uranium dioxide powder or pellets from outside sources. This represents about 5½% of all commercial purchases to date. These purchases should be sufficient to meet Combustion Engineering's uranium needs for its existing contractual agreements.

54. Combustion Engineering obtained its first contract to supply nuclear fuel in 1961; a contract with the AEC to supply fuel assemblies for its Bonus reactor. The firm was unsuccessful in its first two bids to supply NSSS units to domestic utilities: in 1964 it bid on Commonwealth Edison's Dresden #2 (715 MW$_e$), and in 1965 a 420 MW$_e$ unit for Rochester Gas & Electric.

55. Between 1966 and June of 1968, Combustion Engineering bid on 25 NSSS units, and was awarded seven with an option on an eighth. Each of these NSSS

contracts provides that Combustion either supply the core, or at least design and fabricate it; and provides for either a firm obligation to supply some reloads or an option agreement for reloads.

56. Combustion Engineering's NSSS contracts are as follows:

(a) Consumers Power Palisades was awarded in 1966 with a projected start-up date of 1970. The utility has an option to purchase three reload batches; assuming the option is not exercised, the first reload batch that would be supplied by someone other than Combustion Engineering would be in 1971. The core was bid on a fabrication-only basis.

(b) Omaha Public Power Fort Calhoun was awarded in 1966 with a projected start-up date of 1971. The core and three firm reload batches were awarded, with three additional reloads subject to cancellation. In the event the utility exercises its option to cancel, the first reload batch that would be supplied by someone other than Combustion Engineering would be in 1973.

(c) Maine Yankee was awarded in 1966 with a projected start-up date of 1972. The core, and three reload batches subject to an option to cancel, were included. In the event the utility exercises its option to cancel, the first reload batch that would be supplied by someone other than Combustion Engineering would be in 1973. The core was bid on a fabrication-only basis.

(d) Baltimore Gas & Electric Calvert Cliffs #1 and #2 were awarded in 1967 with respective start-up dates of 1973 and 1974. Two firm fabrication-only reload batches were awarded for each unit. The first reloads over and above those contracted for will be necessary in 1977 and 1978, respectively.

(e) Northeast Utilities Millstone #2 was awarded in 1967 with a projected start-up date of 1974. The core

and two fabrication-only reload batches were included in the contract. The first reloads over and above those contracted for will be necessary in 1978.

(f) Florida Power & Light Hutchinson Island #1 was awarded in 1967 with a projected start-up date of 1973. The core and three firm reload batches were included in the contract. The first reloads over and above those contracted for will be necessary in 1977.

(g) An option to supply Florida Power & Light Hutchinson Island #2.

57. Since its early bid on the AEC's Bonus reactor, Combustion Engineering has not bid on reload fuel contracts for reactors manufactured by other suppliers.

58. Combustion Engineering's bids on NSSS units have tended to be higher than those of competitors. In general, the higher costs relate to the fuel portion of the bid. One factor in this disparity has been Combustion's inability to procure uranium at prices comparable to those paid by General Electric and Westinghouse, both of which made extensive purchases at favorable prices in 1965 and 1966. Another cause of higher costs is the fact that Combustion Engineering's reactors require more fuel than many of its competitors' reactors, due to the conservative design currently being utilized by Combustion Engineering. In addition, competitive factors such as heat rate, burn-up rate, and the enrichment level of the fuel are determined by the design of the reactor.

59. Combustion Engineering's avowed purpose in attempting to acquire United Nuclear is to insure a source of low-cost uranium, and to broaden Combustion Engineering's participation in the fuel cycle.

60. United Nuclear has submitted bids in the three possible situations in which a utility can have reloads up for bid: the Consolidated Edison and American Electric Power awards (see Findings 41(c) and (d) ) were secured contempor-

aneously with the award of the NSSS unit and core; the bid to Consumers Power Palisades was to supply reloads which the utility already had contracted out subject to a right of cancellation; and the award of a reload contract to supply Commonwealth Edison Dresden #1 was to supply reloads to be inserted in the reactor after the original core and reloads were expended (see Finding 41 (a)).

61. United Nuclear is technically competent and willing to supply initial cores to utilities which purchase hardware only from an NSSS supplier. To date, there has never been an opportunity to submit such a bid, but it is probable that within the next five years there will be instances in which utilities will be requesting competitive bids on initial cores.

62. With two minor exceptions, NSSS manufacturers have not submitted bids to supply reloads for reactors manufactured by their competitors.

63. United Nuclear and Combustion Engineering have been involved in four transactions in which they have both submitted bids for reloads:

(a) Combustion Engineering submitted a bid on an NSSS unit, cores, and reloads for Commonwealth Edison's Dresden #1 and #2. Babcock & Wilcox submitted a similar bid. The fuel portion of the Babcock & Wilcox bid, about $47,000,000, was to be supplied by United Nuclear to Babcock & Wilcox, Commonwealth Edison was aware of the role which United Nuclear would play, if Babcock & Wilcox were awarded the NSSS contract. (The award went to General Electric, however).

(b) Combustion Engineering was awarded Baltimore Gas & Electric Calvert Cliffs #1 and #2. The original award provided that Combustion Engineering would supply the reloads on either a comprehensive or a fabrication-only basis. Before it was finally determined whether or not the reloads would be fabrication only, Baltimore

Gas & Electric's consultant invited United Nuclear to bid on the reloads. United Nuclear's understanding was that no commitment had been made regarding the reloads, and a proposal for approximately $36,400,000 in reload fuel was submitted. Subsequently, Combustion Engineering was awarded the reload contract on a fabrication-only basis.

(c) Combustion Engineering was awarded the NSSS contract for Consumers Power Palisades, and an option to purchase three reloads was part of this contract. In April of 1968, Consumers Power solicited, and United Nuclear submitted, a bid to supply the three reloads already on option from Combustion Engineering. United Nuclear's bid was approximately $49,000,-000, with an alternative proposal covering $81,000,000 worth of reloads.

(d) In April of 1968, Consumers Power requested NSSS bids for its projected Midland #1 and #2 stations. All four NSSS suppliers submitted bids covering hardware, cores, and reloads. United Nuclear was asked to, and did, submit bids for nuclear fuel on all four types of reactors. Babcock & Wilcox was awarded the NSSS contract and the original cores. Procurement of reloads is presently suspended.

64. On the basis of a 30-year useful life and present dollar value, the seven reactors to be supplied by Combustion Engineering will require $1,500,000,000 worth of reload fuel in addition to that already under contract.

65. It takes approximately two years to process uranium ore into fabricated fuel, hence the minimum lead-time for ordering reloads is two years. If design work is necessary, then at least an additional year must be added to this lead-time. On the basis of a three-year lead-time, and assuming that the utilities do not exercise their options to purchase reloads or decide to have competitive bids on the optioned reloads, there will be bidding on reloads for Combustion Engi-

neering reactors from the present time (United Nuclear has already bid on Consumers Power Palisades) until 1975. It is probable that the purchasing utilities will solicit bids on reloads in advance of the three-year lead-time.

66. The market shares of the NSSS manufacturers since 1963 are as follows:

| Year | Supplier | % | $MW_e$ |
|------|----------|---|-----|
| 1963 | General Electric | 53 | 1015 |
| | Westinghouse | 47 | 892 |
| | Babcock & Wilcox | 0 | 0 |
| | Combustion Engineering | 0 | 0 |
| 1964 | General Electric | 0 | 0 |
| | Westinghouse | 0 | 0 |
| | Babock & Wilcox | 0 | 0 |
| | Combustion Engineering | 0 | 0 |
| 1965 | General Electric | 52 | 2086 |
| | Westinghouse | 48 | 1895 |
| | Babcock & Wilcox | 0 | 0 |
| | Combustion Engineering | 0 | 0 |
| 1966 | General Electric | 50 | 8437 |
| | Westinghouse | 28 | 4794 |
| | Babcock & Wilcox | 15 | 2509 |
| | Combustion Engineering | 7 | 1157 |
| 1967 | General Electric | 25 | 6656 |
| | Westinghouse | 40 | 10557 |
| | Babcock & Wilcox | 16 | 4089 |
| | Combustion Engineering | 19 | 4818 |
| 1968/ June | General Electric | 62 | 6230 |
| | Westinghouse | 23 | 2350 |
| | Babcock & Wilcox | 15 | 1500 |
| | Combustion Engineering | 0 | 0 |

67. The chart below sets forth the approximate market shares of the present fuel suppliers, taking into account both initial and reload fuel contracts awarded from January 1, 1966 to June 30, 1968, and measured in terms of percentages of the total dollar volume of such contracts:

### INITIAL CORES AND REPLACEMENT FIRM AND OPTION

| | COMPREHENSIVE | FABRICATION ONLY | COMBINED |
|---|---|---|---|
| Total sales: | $1,331,996,000 | $1,101,256,000 | $2,433,252,000 |
| General Electric | 38.5% | 42.8% | 40.4% |
| Westinghouse | 35.0% | 32.2% | 33.7% |
| Babcock & Wilcox | 8.1% | 11.5% | 9.7% |
| Combustion Engineering | 7.7% | 8.8% | 8.2% |
| United Nuclear | 10.7% | 4.7% | 8.0% |

68. The chart below sets forth the approximate market shares of present suppliers of initial cores, measured in terms of percentages of the dollar volume of contracts for initial cores from January 1, 1966 to June 30, 1968:

### INITIAL CORES

| | COMPREHEN-SIVE | FABRICATION ONLY | COMBINED |
|---|---|---|---|
| Total Sales | $432,072,000 | $513,049,000 | $946,021,000 |
| General Electric | 36.4% | 50.8% | 43.6% |
| Westinghouse | 34.5% | 25.5% | 30.0% |
| Babcock & Wilcox | 16.2% | 12.7% | 14.5% |
| Combustion Engineering | 12.9% | 11.0% | 12.0% |

69. The approximate market shares of the five present suppliers of reload fuel, measured in terms of percentages of the dollar volume of reload contracts awarded from January 1, 1966 to June 30, 1968, are set forth below according to the various categories of orders obtained:

### FIRM ORDERS—RELOADS

| | COMPREHEN-SIVE | FABRICATION ONLY | COMBINED |
|---|---|---|---|
| Total sales: | $850,860,000 | $512,164,000 | $1,363,024,000 |
| General Electric | 41.7% | 40.9% | 41.4% |
| Westinghouse | 37.2% | 36.1% | 36.8% |
| Babcock & Wilcox | 4.5% | 9.7% | 6.5% |
| Combustion Engineering | 5.5% | 6.6% | 5.9% |
| United Nuclear | 11.1% | 6.7% | 9.4% |

### OPTIONS—RELOADS

| | COMPREHEN-SIVE | FABRICATION ONLY | COMBINED |
|---|---|---|---|
| Total sales: | $48,164,000 | $76,043,000 | $124,207,000 |
| General Electric | – | – | – |
| Westinghouse | – | 51.6% | 31.6% |
| Babcock & Wilcox | – | 15.7% | 9.6% |
| Combustion Engineering | – | 8.8% | 5.4% |
| United Nuclear | 100% | 23.9% | 53.4% |

70. Supplying fabricated nuclear fuel on a thermal-warranty basis is a highly complex and sophisticated business enterprise. Before a corporation can qualify to supply fabricated fuel on a warranty basis, it must develop a competent design and engineering staff representing various technical and professional disciplines. Staffing is difficult, since there is a shortage of qualified personnel. However, by current corporate standards the capital investment required to establish

manufacturing, testing, and research and development facilities is not high. After a corporation acquires the necessary personnel and establishes its facilities, it must then strive for acceptance by the utilities. This, too, is difficult, because of the nature of the product, its costs, and the financial losses which a utility would incur if the fabricated fuel failed to function properly in its reactor. Fuel management, a significant factor in net generating costs, is highly important to the utilities, and is a further problem area in which technical competence is difficult to develop.

71. The AEC in *The Nuclear Industry—1967* lists the following companies, in addition to United Nuclear and the four reactor manufacturers, as fabricators of uranium oxide fuels: Atomics International, General Dynamics Company, National Lead Company, Nuclear Fuel Services, Inc., and Nuclear Materials and Equipment Co. (NUMEC).

72. The following companies have the scientific and technical expertise, manufacturing potential, and nuclear experience to compete for fabricated fuel sales, providing the required capital investment were made: Nuclear Fuel Services, Inc., NUMEC, National Lead Company, Kerr-McGee, and Gulf General Atomic.

73. On February 13, 1969, National Lead Company and The Anaconda Company announced a joint one-year program of study of nuclear fuels for electric power generation. Anaconda is the owner of substantial uranium reserves and is one of the nation's major producers of $U_3O_8$. Upon completion of the study, the companies will decide whether or not they will undertake a joint effort to compete for nuclear fuel fabrication contracts. Both companies' have adequate financial resources to undertake such a joint effort.

74. On March 13, 1969, Aerojet-General Corporation and Continental Oil Company announced the formation of C/A Nuclear Fuels to supply nuclear fuel and related services to electric utilities. C/A Nuclear Fuels will endeavor to develop a fuel supply capability in the nuclear field. It is the intent of C/A Nuclear Fuels to design, fabricate, and test for qualification, full-scale nuclear fuel bundles. C/A Nuclear Fuels expects to sell a qualification nuclear fuel reload assembly to a public utility by 1971 for installation in a nuclear reactor by 1974; and expects to have a nuclear fabrication plant in commercial operation by the mid-1970's. Aerojet-General Corp. has been involved in the nuclear industry for twelve years, including manufacture of fuel elements for the Experimental Breeder Reactor II. Also, Aerojet owns 50% of Idaho Nuclear Corporation, which is the prime operating contractor for the Atomic Energy Commission's facilities at the National Reactor Testing Station near Idaho Falls, Idaho. Continental Oil is independently engaged in exploration for uranium and has announced the discovery of several deposits of uranium in Southern Texas. Evaluation of these and two other deposits is continuing. Continental, in conjunction with others, is studying the feasibility of constructing a uranium mill.

75. On March 18, 1969, Standard Oil Company (New Jersey) announced that its subsidiary, Jersey Enterprises, Inc., would undertake a nuclear fuel research and development program. Jersey Enterprises, Inc. has engaged Battelle-Northwest to perform research and development work for the project. Battelle-Northwest has had experience in the fabrication of nuclear fuel elements for experimental reactors. Standard Oil has engaged in extensive exploration for uranium and owns proven uranium reserves. Standard Oil has ample financial resources, and intends to begin construction of facilities in 1970.

76. On March 2, 1969, Kerr-McGee Corporation announced construction of a plutonium fuels processing and fabrication plant. Kerr-McGee produces more uranium and owns more announced proven reserves than any other American company. It has adequate financial resources, and intends to compete for nuclear reload fuel contracts in the future.

77. National Lead Company and The Anaconda Company, C/A Nuclear Fuels, Jersey Enterprises, Inc., and Kerr-Mc-

Gee Corporation have already advised public utility companies of their respective intentions. Jersey Enterprises, Inc. has actually offered to supply a dummy qualification nuclear fuel assembly to both Consolidated Edison Company of New York, Inc. and Commonwealth Edison Company for installation in their respective developmental size reactors. Neither utility expressed interest in this offer.

78. Of the companies listed in Findings 71 through 76, NUMEC has made the greatest progress toward becoming an active participant in the reload fuel business.

79. In May and June of 1968, NUMEC submitted (unsuccessfully) a bid for reload fuel for the currently operational 70 $MW_e$ Consumer's Big Rock reactor. The fuel bid was on a mechanical-warranty only basis. In September of 1968, NUMEC bid on qualification assemblies and reloads for the 462 $MW_e$ Connecticut Yankee reactor. This bid was on a mechanical-warranty only basis. The contract has not yet been awarded. NUMEC's present manufacturing facilities are not adequate to supply the reloads for these Consumers Power and Connecticut Yankee contracts.

80. The Connecticut Yankee bid required the supplier to bid on one or two qualification assemblies and three reload batches. The evaluation of the bid is a two-step process: of the responsive bidders, the utility will select one, none, or all, to supply qualification assemblies; these assemblies are then placed in the reactor and evaluated for performance, whereupon the utility will select a reload supplier on the basis of cost to the utility and the performance of the qualification assemblies. The reload fuel will be supplied in accord with detailed design specifications supplied by the utility, and the supplier will be required to give a mechanical warranty on the fuel. In this bidding arrangement, the original NSSS supplier is not required to submit quali-

fication assemblies, since it has already supplied the original core.

81. NUMEC has none of the critical facilities necessary to evaluate and test fabricated fuel design. Also, AEC licensing is necessary before beginning constructing of a critical facility. NUMEC would require additional manufacturing facilities before it could supply reloads for 1,100 $NW_e$ reactors.

82. United Nuclear's competition with the NSSS suppliers for reload contracts has had the following effects:

(a) United Nuclear has provided direct competition in cost and design.

(b) United Nuclear's policy of disclosing to the utilities its fuel-design specifications makes it unnecessary for subsequent reload bidders to duplicate this design and engineering work. This policy has caused the utilities to request and secure more design information from their NSSS suppliers.

(c) United Nuclear's policy of providing computer software and other fuel-management information to the utilities has increased the utilities' knowledge in this area.

(d) United Nuclear's presence in the market has enabled utilities to reduce the number of firm reloads included in the original NSSS contracts.

83. After World War II, the AEC set up a uranium-purchasing program to stimulate exploration and development. Yellowcake was purchased at $8 per pound. In 1958, the AEC restricted its purchase program to proven ore reserves as of that date. All purchase contracts were to be performed by 1966; however, delivery dates on these contracts were later extended to 1968. Additional contracts were entered into with 1969 and 1970 delivery dates, under a cost formula with a maximum purchase price of $6.70 per pound. It is estimated that present ore reserves will be exhausted by 1980.

## DISCUSSION

The ultimate issue before the Court is whether the merger[1] of United Nuclear

---

1. Since Combustion Engineering's purchase of United Nuclear's stock is the first step in its plan to effectuate some form of

corporate take-over, for convenience this transaction will be referred to as a "merger" or "acquisition."

Corp. with Combustion Engineering, Inc. would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.[2] As detailed in the foregoing findings of fact, the defendant, Combustion Engineering, Inc., is one of the four manufacturers of nuclear power plants, while the plaintiff, United Nuclear Corp., is the only "independent" supplier of fabricated nuclear fuel, and is also a major supplier of uranium.

Before considering the specific issues involved in judging this proposed merger by Clayton Act standards, it is necessary to dispose of defendant's suggestion that the role of the Atomic Energy Commission in the development of the uranium industry, and in fostering peaceful uses of nuclear energy, has been such that the Court should hesitate to set aside this acquisition on antitrust grounds, absent AEC participation in this lawsuit.

■ One rather obvious weakness in this argument is that the failure of the AEC to attempt to intervene may well represent mere neutrality, or the belief that its views are being adequately presented by the plaintiff; there is no reason to equate AEC silence with espousal of the defense viewpoint. But the conclusive answer is found in 42 U.S.C. § 2135, which provides:

"(a) Nothing contained in this chapter shall relieve any person from the operation of sections * * * 14–19 * * * of Title 15 * * *."

The legislative history of the Private Ownership of Special Nuclear Materials Act of 1964, 110 Cong.Rec. 20140–145, reveals a Congressional intent to create an independent uranium industry; there is no suggestion that it was to be accorded any special exemption from Section 7 of the Clayton Act.

Accordingly, it is necessary to determine whether Section 7 would be violated by this merger. This requires definition of relevant line(s) of commerce and geographic market,[3] and a decision as to whether it is probable that the merger would substantially lessen competition.

## I The Horizontal Aspects of the Merger

### (a) The Product Market

■ I have no difficulty in concluding that fabricated nuclear fuel (initial cores and reloads) is a distinct line of commerce, and that replacement fuel constitutes a sub-market within that general market. Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) provides the definition:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it." (370 U.S. at 325, 82 S.Ct. at 1524)

Since NSSS units utilize only this kind of fuel, it obviously forms a separate line of commerce for Section 7 purposes.

The reload sub-market is the only market specifically pleaded in plaintiff's complaint (except for the general allegations of paragraph 28(f) ). But there was much evidence at trial as to the effect of the merger upon the initial-core portion of the fabricated-fuel market as well. Hence, under Fed.R.Civ.P. 8(b), this issue also may properly be "treated in all respects as if [it] had been raised in the pleadings." Separate consideration of the reload sub-market is appropriate because reload fuel has always been treated in the industry as a separate item, primarily by reason of the

---

2. "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital * * * of another corporation engaged also in commerce, where in any of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."

3. The parties agree that any relevant geographic market is national in scope. This facet of the problem therefore need not be discussed.

thermal-warranty practice surrounding NSSS purchases.

The defendant argues that there is no present market for reload fuel, since most of the NSSS units now on order will not require further fuel deliveries until 1975. However, the market is established as of the bid date, not the delivery date, and it is quite clear that there have been, and will continue to be, reload contracts up for bids. Since 1966, the plaintiff has bid on reload contracts aggregating a half-billion dollars. The accepted minimum "lead-time" of two or three years between contract and delivery insures that even post-1975 deliveries will be up for bid in the fairly near future. Moreover, utilities ordering NSSS units may choose to solicit reload bids at the same time.

It is true that the future volume of reload contracts will no doubt greatly exceed present levels, but this does not warrant the conclusion that there is no "true" present market, as defendant contends. The application of the antitrust laws cannot be postponed in order to permit anti-competitive patterns in emerging industries to harden and become institutionalized.

(b) The Probable Effect

In applying Section 7 to this proposed merger, it is important to consider the present market structure.[4] By any standard, the nuclear fuel market must be regarded as highly concentrated. There are only five firms in the field and two of these, General Electric and Westinghouse, control nearly three-fourths of total sales by dollar volume (74.1% of the fabricated-fuel market, 74.3% of the reload market, during the period January 1, 1966–June 30, 1968).[5] Moreover, existing barriers to entry, while not insurmountable, are quite high. Notwithstanding the interest that is now being demonstrated by a number of potential entrants, it is doubtful that any significant new competition in these markets can be expected for several years.

The proposed merger would combine plaintiff's 8% share of the fabricated-fuel market with defendant's 8.2% to produce a total market share of 16.2%. In the reload sub-market, plaintiff's 13.-1% added to defendant's 5.9% would produce a combined market share of 19%.

In United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) [hereinafter PNB] the Supreme Court declared that a horizontal merger is presumed to be illegal if it

"* * * produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market * * * in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." (374 U.S. at 363, 83 S.Ct. at 1741)

In United States v. Aluminum Co. of America et al., 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) the Court reiterated the principle that the greater the degree of existing concentration in the relevant market, the smaller the percentage of increase which can withstand Section 7 scrutiny. See, United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

In United States v. Vons Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the merger of the third and sixth largest grocery chains in Los Angeles was invalidated, because

---

4. *See generally*, Brodley, Oligopoly Power Under the Sherman and Clayton Acts— From Economic Theory to Legal Policy, 19 Stan.L.Rev. 285 (1967) ; Mueller, The New Antitrust: A "Structural" Approach, 12 Vill.L.Rev. 764 (1967) ; Bain, Barriers to New Competition, 1–42 (1956).

5. Defendant emphasized at trial the limited number of instances in which the parties have been in direct competition with each other. This factor has little significance. United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). See also FTC v. Proctor & Gamble Co., 386 U.S. 568, 578, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967).

of a discernible trend toward concentration,[6] and because it would have resulted in a combined market share of 7.5%. This case is especially significant because the existing market was rather loosely structured, in contrast to the tight structure of the markets now being considered.[7]

In light of these decisions, it would be difficult to escape the conclusion that the increase in market-share concentration, standing alone, would put the merger of plaintiff and defendant at odds with Section 7. But there is much more to the present case than mere arithmetic.

The fact is that the plaintiff is the only firm competing for reload contracts, since the four NSSS vendors do not bid on reloads for each other's reactors. If plaintiff and defendant were to merge there would be no competition at all in the reload market (except that which might be incidentally involved in the bidding for reactors), barring a complete change of policy by the defendant or the other NSSS vendors.

It is therefore highly probable that the proposed merger would have consequences far beyond what the statistics of market-share increase might indicate. Plaintiff has had a very healthy effect upon the competitive status of the market, not only by providing direct competition with each of the NSSS vendors for reloads, but by promoting freer exchange of fuel specifications between vendors and utilities; an exchange which, together with developing experience, is gradually altering warranty policies and bid practices with respect to the NSSS units themselves. Removal of plaintiff from the arena by the proposed merger would probably produce a market in which each NSSS vendor would have an effective monopoly on the reload business for all of its reactors, and each would have little incentive to attempt to develop competence to supply reloads to any other kind of reactor.

Apart from these stark effects upon competition, the elimination of United Nuclear would probably produce the following additional anti-competitive effects: an increased tendency for utilities to make long-range commitments for NSSS vendors to supply reloads, thus further discouraging entry into the market by new firms; a reduction in incentive for design improvement, due to absence of United Nuclear's design competition; and a reversal of the trend toward disclosure of fuel design specifications.

The defendant does not actually dispute the likelihood of these anti-competitive effects of the proposed merger. Rather, the defendant seeks to justify the proposed merger by pointing out its beneficial effects upon competition in the NSSS market. Defendant argues that Combustion Engineering will be a much stronger competitor with General Electric and Westinghouse if it can gain access to its own source of uranium reserves.

■ This argument must be rejected. In the first place, there is no persuasive evidence that the proposed acquisition alone would significantly enhance Combustion's competitive position in the NSSS market (see Finding of Fact 58); and there is no basis in the record to support the value judgment that the NSSS market is "more critical" or of greater value to the nation's economy than the fuel markets.[8] But even accepting these

---

6. Unlike *Vons Grocery* there is no trend toward concentration in the present case. However, the absence of such a trend is not significant if the industry is already highly concentrated. See, United States v. Pabst Brewing Co., 384 U.S. 546, 552, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).

7. If *Vons Grocery* truly represents a movement in antitrust policy toward protecting competitors rather than competition,

as Justice Stewart indicates in his dissenting opinion, the proposed merger of United Nuclear by Combustion is clearly violative of Section 7. *See,* United States v. Provident Nat'l Bank, 280 F.Supp. 1 (E.D.Pa.1968).

8. As Justice Brennan points out in PNB, it is not within the proper judicial function to undertake such a task. 374 U.S. at 371, 83 S.Ct. 1715.

555

factual premises, defendant's legal theory is contrary to Section 7. The doctrine of "countervailing power" referred to in United States v. Lever Brothers Co., 216 F.Supp. 887 (S.D.N.Y. 1963), has been totally rejected by the Supreme Court in the PNB case. 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

■ It is simply not legally possible to permit a clear violation of the Clayton Act in one line of commerce in order to strengthen competition in another line of commerce.[9]

## II The Vertical Aspects of the Merger

■ Having determined that this acquisition violates Section 7 because of its horizontal effects, I need not, strictly speaking, consider its vertical implications. However, in the interest of completeness, and because of the importance of the issues involved, I believe the vertical aspects should also be dealt with in this opinion.

There is no question that the yellowcake market constitutes a line of commerce of national scope. Combustion's acquisition of United Nuclear would represent backward vertical integration, i.e., acquisition of a supplier by a customer. To date, Combustion's purchases of yellowcake represent 5½% of all commercial purchases, and United Nuclear's sales account for 19% of all commercial sales. The current reserves of $8 per pound uranium will be expended by 1980. United Nuclear owns 15% of these $8 per pound reserves.

The guidelines for the application of Section 7 to vertical mergers are not clearly etched. The case law has not developed rapidly, and the principles evolving from the cases are complex. As stated by Professor Turner:

"Vertical acquisitions seem to stand on a middle ground. Generally speaking, the anti-competitive consequences of a vertical merger appear more remote than those of a horizontal merger of substantial competitors, since the vertical merger * * * does not

per se increase the market position of merged companies in either of the two markets involved." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1321 (1965).

However, a particular vertical merger may result in a transfer of oligopolistic market conditions from one market to another, or in other anti-competitive effects.

United Nuclear argues that the proposed merger will substantially lessen competition because it will foreclose other uranium suppliers from Combustion, foreclose the other NSSS suppliers and utilities from United Nuclear, and cause Combustion to drop its uranium exploration activities. Combustion's brief is less than responsive to these contentions.

■ The basic guidelines for determining the validity of vertical mergers were established in Brown Shoe. Market foreclosure is the initial point of reference. The present case is typical of vertical cases in that "the foreclosure is neither of monopoly nor de minimis proportions." 370 U.S. at 329, 82 S.Ct. at 1526. Certainly, 5½% of commercial uranium purchases and 19% of sales cannot be characterized as either monopolistic or de minimis.

However, the market statistics require further analysis. Antitrust cases generally involve high demand consumer products, and as a consequence projections of past market shares into the future can be made with relative accuracy. Here, the number of consumers, i.e., utilities, is small, yet one corporate decision can have dramatic impact on market statistics. More specifically, Combustion's yellowcake requirements are dependent on many factors: the number of NSSS awards it receives in the future; the extent to which initial cores or reloads are ordered on a fabrication-only basis; the number of reload option contracts awarded to Combustion which are eventually performed; and Combus-

9. By reason of the conclusion that Section 7 is violated, the plaintiff's claims relat-
ing to section 1 of the Sherman Act are superfluous and need not be considered.

tion's success in securing additional reload contracts. In light of these contingencies, it is difficult to forecast Combustion's future demand for yellowcake.

For similar reasons, it is difficult to gauge the extent of the foreclosure of United Nuclear as a supplier. Captivity of United Nuclear by Combustion would foreclose United Nuclear as a source of supply only to the extent of Combustion's needs.

*Brown Shoe* also requires consideration of the purpose of the vertical integration. Combustion's immediate purpose is to insure ready access to proven ore reserves, so it can obtain ore at prices comparable to those which Combustion believes General Electric and Westinghouse have paid under long-range delivery contracts. Ultimately, Combustion hopes to increase its competitive strength as an NSSS vendor.

In relating purpose to Section 7 application, the Court in *Brown Shoe* looked to the prior law under section 3 of the Sherman Act, and carried forward into Section 7 the distinction between tying contracts and requirements contracts. The *Brown Shoe* acquisition was considered analogous to a tying contract, and the Court applied the stringent standards applicable to such contracts. Here, the acquisition is analogous to a requirements contract, and, therefore, the significance to be attached to the purpose of the acquisition is less.

The remaining factor under *Brown Shoe* is whether or not there is a trend toward vertical integration in the industry, and, if so, what effect this trend can be expected to have on concentration in the market of either supplier or buyer. It is clear on the present record that the proposed acquisition is the first attempt toward vertical integration. However, the plaintiff's expert opined that consummation of the proposed acquisition would trigger further vertical acquisitions, on the theory that Combustion's need to overcome high ore costs is not unique, and supports the inference that similar acquisitions by the NSSS manufacturers would follow.

Assuming that further integration will occur, it is difficult to determine what effects, if any, the acquisition will have on concentration in either market area. There are presently 47 companies or joint ventures actively exploring for uranium deposits, and 17 operating uranium mining facilities. Moreover, United Nuclear's market share of 15% of proven ore reserves is based solely on $8 per pound uranium, and in no way takes into account the substantial uranium reserves which the AEC has acquired through its purchase programs. In the NSSS market, with its four participants, no firm prediction can be made.

A related factor is the effect that vertical integration by the NSSS vendors might have on potential entrants into the fabricated-fuel market. Although the record is silent as to the profitability of participation in the fabricated-fuel market by General Electric, Westinghouse, and Babcock and Wilcox, it is clear that neither Combustion nor United Nuclear has yet turned a profit. Potential entrants faced with this fact may be more reluctant to enter if they are confronted with the prospect of competing with integrated NSSS suppliers. Thus it seems reasonable to suppose that vertical integration of NSSS suppliers would have some adverse effect upon the entrance situation.

Plaintiff relies on United States v. Kennecott Copper Corp., D.C., 231 F. Supp. 95 (1964), aff'd per curiam, 381 U.S. 414, 85 S.Ct. 1575, 14 L.Ed.2d 692 (1965). There the Court held that the merger of *Kennecott,* a copper producer, and the Okonite Company, the second largest fabricator of insulated copper wire, violated Section 7. A market trend toward forward vertical integration and cyclical over-supply had caused a sharp reduction in the number of independent fabricators. The Court also found that post-acquisition Kennecott was the sole supplier of Okonite. *Kennecott* differs from the case before this Court in that here there has been no previous vertical integration, and the number of competitors in the uranium mar-

ket has not been decreasing. However, these are matters of degree.

United States v. Standard Oil Co. (New Jersey), 253 F.Supp. 196 (D.N.J. 1966) was a backward vertical integration case in the potash market. Standard attempted to acquire Potash Co. of America, the largest domestic firm of the ten potash suppliers, in order to insure the potash necessary for its fertilizer production. Standard's estimated requirements for 1965 were less than 1% of the world-wide market or 2.5% of the domestic market. Market forecasts indicated that by 1971 Standard's requirements would double. Although Standard's 1971 needs would constitute only 29% of the acquired firm's capacity, this amount was greater than the capacity of the two smallest potash suppliers. The case is distinguishable from the present case to the extent that a trend of backward integration already existed at the time of merger.

Plaintiff also argues that Combustion will be likely, post-merger, to abandon its uranium exploration efforts, and that this elimination of a potential entrant is an independent basis for holding that the acquisition is anti-competitive. The leading case on potential entrants is United States v. El Paso Natural Gas Co., *supra.* El Paso involved the potential entrance of a going company with natural gas reserves into a new section of the country. Here the situation is more attenuated, since Combustion is only exploring at present. Moreover, in *El Paso,* the merger was horizontal in nature, and the acquired firm had actively competed against and was found to have had a substantial competitive impact on the acquiring firm. Again, the present case differs in that Combustion is one of 47 companies presently exploring for uranium, and, consequently, the elimination of Combustion as a potential entrant would have a very different impact on competition.

*Standard Oil* also considered the potential entrant question and gave weight to the fact that Standard Oil would be eliminated as a potential entrant. Again,

the market structure in that case is factually distinguishable, and Standard Oil's progress in becoming a competitor was somewhat different.

 Although the question is close, on the present record it is my opinion that plaintiff has not carried its burden of establishing that a substantial lessening of competition in the yellowcake market is likely. The market share statistics are inconclusive. There has been no trend toward vertical integration, and the effects of vertical integration on concentration in the uranium or NSSS market are conjectural.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter.

2. Venue is proper in this judicial district.

3. The following are lines of commerce within the meaning of Section 7 of the Clayton Act:

(a) Fabricated nuclear fuel

(b) Reload fuel

(c) Yellowcake ($U_3 O_8$)

4. As to each of these lines of commerce, the United States as a whole is the appropriate section of the country, within the meaning of Section 7 of the Clayton Act.

5. The effect of Combustion Engineering's acquisition of the stock of United Nuclear may be substantially to lessen competition in the lines of commerce of fabricated nuclear fuel and reload fuel.

6. The acquisition of United Nuclear's stock by Combustion Engineering is a violation of Section 7 of the Clayton Act.

7. Plaintiff is entitled to permanent injunctive relief, the precise extent and form of which should be determined after further proceedings. In the meantime, the order entered July 1, 1968, as amended July 8, 1969 and September 20, 1968, should remain in full force and effect.

# APPENDIX A

## Central Station Nuclear Power Plants

### Operating, Under Construction or on Order

| Contract Awarded | Utility & Plant | State | Reactor Supplier | Size (Mwe-Net) | Est. Cost* (Millions) | Commercial Operation |
|---|---|---|---|---|---|---|
| 1953 | Duquesne (Shippingport #1) | Pa. | W | 90[a/] | $ 69 | 1957 |
| 1955 | Commonwealth Ed. (Dresden #1) | Ill. | GE | 200 | 51 | 1960 |
| | Consolidated Ed. (Indian Pt. #1) | N.Y. | B&W | 265[b/] | 107 | 1963 |
| | | | | 465 | $ 158 | |
| 1956 | Yank. At. El. Co. (Yankee) | Mass. | W | 175 | $ 39 | 1961 |
| 1957 | Pwr. React. Dev. Co. (Fermi) | Mich. | PRDC | 61 | $ 66 | -- |
| | Northern States (Pathfinder) | S.D. | AC | 59 | 26 | 1967 |
| | | | | 120 | $ 92 | |
| 1958 | Phila. El. (Peach Bottom #1) | Pa. | GA | 40 | $ 28 | 1967 |
| | Rur. Coop. Pwr. Assoc. (Elk River) | Minn. | AC | 22[b/] | 14 | 1964 |
| | Pacific Gas & El. (Humboldt Bay) | Cal. | GE | 69 | 24 | 1963 |
| | | | | 131 | $ 66 | |
| 1959 | City of Piqua, Ohio (Piqua) | O. | AI | 11 | $ 16 | 1964 |
| | Consumers Power Co. (Big Rock Pt.) | Mich. | GE | 70 | 28 | 1963 |
| | | | | 81 | 44 | |
| 1960 | Puerto Rico Wtr. Res. Auth. (BONUS) | P.R. | CE | 17 | $ 19 | 1965 |
| 1962 | Dairyland Power Coop. (LaCrosse) | Wisc. | AC | 50 | $ 19 | 1968 |
| | Conn. Yank. A. P. Co. (Conn. Yankee) | Conn. | W | 462 | 87 | 1968 |
| | Washington Pub. Pwr. Sup. Sys. (NPR) | Wash. | GE | 790 | 315 | 1966 |
| | | | | 1,302 | $ 421 | |
| 1963 | SCE and SDG&E (San Onofre) | Cal. | W | 430 | $ 97 | 1967 |
| | Los Angeles D. W. & P. (Malibu) | Cal. | W | 462 | 83 | 1972 |
| | Jersey Central (Oyster Creek) | N.J. | GE | 515 | 67 | 1968 |
| | Niagara Mohawk (Nine Mile Pt.) | N.Y. | GE | 500 | 89 | 1968 |
| | | | | 1,907 | $ 336 | |
| 1965 | Boston Edison (Pilgrim) | Mass. | GE | 625 | $ 65 | 1971 |
| | Commonwealth Ed. (Dresden #2) | Ill. | GE | 715 | 79 | 1969 |
| | Northeast Utilities (Millstone) | Conn. | GE | 549 | 85 | 1969 |
| | Consolidated Ed. (Indian Pt. #2) | N.Y. | W | 873 | 108 | 1969 |
| | Fla. Power & Lt. (Turkey Pt. #3) | Fla. | W | 722 | 66[c/] | 1970 |
| | Pub. Ser. Co. of Colo. (Fort St. Vrain) | Colo. | GA | 330 | 69 | 1973 |
| | Rochester Gas & Elect. (Robert E. Ginna) | N.Y. | W | 420 | 65 | 1969 |
| | | | | 4,234 | $ 537 | |
| 1966 | Commonwealth Ed. (Dresden #3) | Ill. | GE | 715 | $ 81 | 1970 |
| | Carolina Power & Lt. Co. (Robinson #2) | S.C. | W | 663 | 76 | 1970 |
| | Consumers Power Co. (Palisades) | Mich. | CE | 700 | 75 | 1970 |
| | Wisc. Mich. Power Co. (Point Beach #1) | Wisc. | W | 455 | 61 | 1970 |
| | Common. Ed./Iowa-Ill. (Quad Cities #1) | Ill. | GE | 715 | 90 | 1970 |
| | Common. Ed./Iowa-Ill. (Quad Cities #2) | Ill. | GE | 715 | 77 | 1971 |
| | Northern States (Monticello) | Minn. | GE | 472 | 74 | 1970 |
| | T. V. A. (Browns Ferry #1) | Ala. | GE | 1,065 | ) 235 | 1970 |
| | T. V. A. (Browns Ferry #2) | Ala. | GE | 1,065 | ) | 1971 |
| | Duke Power Co. (Oconee #1) | S.C. | B&W | 874 | 86 | 1971 |
| | Duke Power Co. (Oconee #2) | S.C. | B&W | 874 | 86 | 1972 |
| | Vermont Yankee N.P. Corp. (Vt. Yankee) | Vt. | GE | 514 | 88 | 1971 |
| | P. S. El. & Gas & Others (Burlington #1) | N.J. | W | 999 | 139 | 1971 |
| | Phila. El. & Others (Peach Bottom #2) | Pa. | GE | 1,065 | 138 | 1971 |
| | Phila. Electric (Peach Bottom #3) | Pa. | GE | 1,065 | 125 | 1973 |
| | Va. El. & Power (Surry #1) | Va. | W | 783 | 130 | 1971 |
| | Va. El. & Power (Surry #2) | Va. | W | 783 | 108 | 1972 |
| | Niagara Mohawk (Easton) | N.Y. | GE | 755 | 100 | 1971 |
| | Omaha Pub. Pwr. Dist. (Fort Calhoun) | Nebr. | CE | 450 | 70 | 1971 |
| | Pacific Gas & Elect. (El Diablo) | Cal. | W | 1,060 | 154 | 1971 |
| | Metropolitan Edison (Three Mile Island) | Pa. | B&W | 831 | 116 | 1971 |
| | | | | 16,618 | $2,109 | |
| | Total through 1966 (47 units) | | | 25,140 | $3,890 | |

a/ Limit of T-G capacity. Reactor power 135 Mwe.
b/ Includes capacity of fossil fueled superheater. Electric power from reactor only: Indian Point 151 Mw; CVTR - 14 Mw; Elk River - 16 Mw.
c/ ½ option price on Units #3 & #4, option exercised in 1967.
* Total construction cost. Land, fuel and transmission plant excluded.

## Central Station Nuclear Plants

| Utility & Plant | State | Reactor Supplier | Size (Mwe-Net) | Est. Cost* (Millions) | Commercial Operation |
|---|---|---|---|---|---|
| **NUCLEAR STEAM SUPPLY SYSTEM ORDERS PLACED IN 1967** | | | | | |
| Florida Pwr. & Lt. (Turkey Point #4) | Fla. | W | 722 | $ 66[a/] | 1971 |
| Northern Indiana Pub. Ser. Co. (Bailly) | Ind. | GE | 515 | 91 | 1973 |
| Jersey Central Pwr. & Lt. | N.J. | B&W | 800 | 100 | 1973 |
| Northern States Pwr. Co. (Prairie Is. #1) | Minn. | W | 550 | 100 | 1972 |
| Wisconsin Pub. Ser. & Others (Kewaunee) | Wisc. | W | 527 | 85 | 1972 |
| Commonwealth Ed. (Zion #1) | Ill. | W | 1,050 | 164 | 1972 |
| Commonwealth Ed. (Zion #2) | Ill. | W | 1,050 | 153 | 1973 |
| Florida Pwr. Corp. (Crystal River #3) | Fla. | B&W | 825 | 110 | 1972 |
| Wisc.-Mich. Pwr. Co. (Point Beach #2) | Wisc. | W | 455 | 57 | 1971 |
| Maine Yankee A.P. Co. (Maine Yankee) | Me. | CE | 800 | 100 | 1972 |
| Long Island Lighting Co. (Shoreham) | N.Y. | GE | 540 | 105 | 1973 |
| Ark. Pwr. & Lt. Co. | Ark. | B&W | 800 | 140 | 1973 |
| Consolidated Ed. (Indian Pt. #3) | N.Y. | W | 965 | 159 | 1971 |
| Duke Power Co. (Oconee #3) | S.C. | B&W | 874 | 92 | 1973 |
| Consumers Pub. Pwr. Dist. (Cooper) | Nebr. | GE | 778 | 125 | 1973 |
| Baltimore G.&.E. Co. (Calvert Cliffs #1) | Md. | CE | 848 | 118 | 1973 |
| Baltimore G.&.E. Co. (Calvert Cliffs #2) | Md. | CE | 848 | 105 | 1975 |
| P.S. El. & Gas (Burlington #2) | N.J. | W | 993 | 121 | 1973 |
| N.Y. State El. & Gas Corp. (Milliken) | N.Y. | GE | 829 | 130 | 1973 |
| TVA (Browns Ferry #3) | Ala. | GE | 1,065 | 115 | 1972 |
| Northern States Pwr. Co. (Prairie Is. #2) | Minn. | W | 550 | 98 | 1974 |
| Indiana & Mich. Elect. Co. (Bridgman #1) | Mich. | W | 1,100 | } 300 | 1972 |
| Indiana & Mich. Elect. Co. (Bridgman #2) | Mich. | W | 1,100 | | 1973 |
| Duquesne (Shippingport #2) | Pa. | W | 800 | --[b/] | 1973 |
| Sacramento Mun. Util. Dist. (Rancho Seco) | Cal. | B&W | 800 | --[b/] | 1973 |
| 1967 total through 9/30/67 | (25 units) | | 20,184 | 2,634 | |

### ANNOUNCED AS PLANNED FOR NUCLEAR POWER BUT CONTRACTS NOT AWARDED

| Utility & Plant | Size (Mwe-Net) | Commercial Operation |
|---|---|---|
| SCE and SDG&E (Bolsa Island) | 800 | 1972 |
| Los Angeles D.W. & P. (Bolsa Island) | 800 | 1972 |
| New England Elect. System | 800 | 1973 |
| Portland General Elect. Co. (Trojan) | 1,000 | 1975 |
| Pub. Ser. Co. of N. Hampshire | 800 | 1975 |
| Wash. Pub. Pwr. Sup. Sys. | 1,000 | 1973 |
| Penna. P. & L. (Susquehanna) | 800 | 1974 |
| Northeast Utilities (Millstone Pt. #2) | 800 | 1974 |
| So. Cal. Ed. (Cojo Canyon) | 1,000 | 1975 |
| Georgia Pwr. Co. | 500* | 1974 |
| Atlantic City El. Co. (Bayside) | 1,000 | 1973 |
| Florida Pwr. Corp. | 825 | 1974 |
| | 10,125 | |

---

* These are mostly unofficial figures taken from various published sources and are not necessarily on comparable bases.

a/ 1/2 option price on Units #3 and #4.
b/ Cost estimate not available.